# SCHOOL BOARD OF DADE COUNTY, FLORIDA v. JOHNSON
## Case No. 83-3065
# DEPARTMENT OF EDUCATION, et al. v. JOHNSON
## Case No. 84-0195

State of Florida Division of Administrative Hearings

October 18, 1984

## APPEARANCES OF COUNSEL

**George de Pozsgay** and **Alec Lewis** for petitioner, School Board of Dade County.

**David Holder** for petitioner, Department of Education.

**Ellen L. Leesfield, DuFresne & Bradley,** for respondent.

## OPINION OF THE COURT

JAMES E. BRADWELL, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, James E. Bradwell, held a public hearing in these consolidated cases on April 26 and 27, 1984. By Order dated June 6, 1984, the parties were afforded leave through July 2, 1984 to submit proposed recommended orders to the undersigned for consideration in preparation of this Recommended Order. The parties, through their counsel, submitted proposed recommended orders on July 2, 1984, which were considered by me in preparation of this Recommended Order. To the extent that the parties' proposed findings of fact were consistent with the weight of the credible evidence introduced at final hearing, they were adopted and are reflected in this Recommended Order. To the extent that the findings were not consistent with the weight of the credible evidence, they have been rejected or, when possible, modified to conform to the evidence. Proposed findings that are subordinated, cumulative, immaterial or unnecessary have not been adopted.[1]

## ISSUES

The issues presented herein are whether or not the Respondent, George Archie Johnson, should be dismissed from his employment as a teacher by the Petitioner, Dade County School Board and whether or not disciplinary action should be taken against Respondent's teaching certificate[2] based on allegations set forth in the notice of charges[2] filed by the Petitioner, School Board of Dade County, Florida and the administrative complaint filed by the Petitioner, Commissioner of Education.

## BACKGROUND

The cause was commenced initially on August 24, 1983, when the Petitioner, School Board of Dade County, took action to dismiss Respondent, George Archie Johnson, from all employment by the Dade County School Board. Thereafter, on December 19, 1983, the Commissioner of Education served its administrative complaint which was filed against Respondent Johnson. Respondent's counsel timely appealed both actions and the cases were consolidated by Order dated February 21, 1984. In the administrative complaint filed by the Petitioner, Commissioner of Education, it is alleged that on or about November 12, 1980 and continuing through April 15, 1983, Respondent purchased auto parts on the account of Robert Morgan Voca-

---

[1] The parties waived the time requirement that a recommended order be filed within thirty days following the receipt of the transcript of the proceedings.

[2] Paragraph 7 of the Notice of Charges were voluntarily dismissed by Petitioner.

tional Technical School, where he was employed as an instructor, for his own personal use and despite repeated requests for payments, Respondent failed to pay the account until April 15, 1983; that on or about March 2, 1982, Respondent accepted for repair a 1974 Porsche automobile which was not owned by an employee of the School Board or a student of Robert Morgan, in violation of School Board rules and regulations, and that Respondent received payment for the repair work from the owner but failed to turn the funds over to Robert Morgan; that on or about September 16, 1982 and continuing through August 25, 1983, Respondent ordered parts and materials having a value in excess of $700 for his own personal automobile, charging said parts and materials to the account of Robert Morgan; that Respondent forged, altered and/or incorrectly prepared Work Order No. 10330 on the prescribed School Board form, indicating that parts ordered on the account of Robert Morgan were for a customer of the school when, in truth and in fact, they were ordered for his own personal automobile; that on or about December 5, 1982, Respondent accepted a 1972 Ford LTD automobile for repair at Robert Morgan and received a deposit in the amount of $225 from its owner; that Respondent failed to perform the work promised on said automobile, replaced the existing battery in the automobile with a battery which was inferior and unsuitable for said automobile and converted the original battery for his own use; that Respondent allowed the automobile to be damaged by the elements and that he removed its vinyl top and exposed the interior to the rain; that Respondent failed to perform the agreed repairs, failed to return the deposit and failed to return the automobile at the agreed time; that on or about March 28, 1983, while acting in his capacity as an employee of the Dade County School Board at Robert Morgan, Respondent accepted for repair a Lancia automobile owned by a School Board employee together with a check in the amount of $200 payable to Respondent as a deposit for repairs; that contrary to School Board rules and regulations, Respondent performed the repairs upon said automobile at his personal residence without the permission of the School Board or the owner of the automobile; that Respondent converted the owner's $200 deposit to his own use; that between April of 1983 and August 25, 1983, Respondent falsely accused School Board employees of violation of School Board production policy, rules and regulations, knowing said accusations were false at the time they were made. Based upon these charges, Petitioner, Commissioner of Education, asserts that Respondent has violated Sections 231.28, Florida Statutes, by committing acts of gross immorality or moral turpitude and engaging in personal conduct which seriously reduced his effectiveness as an employee of the Dade County School Board. Further,

Petitioner alleges that the allegations set forth in the administrative complaint are in violation of Rule 6B-1.06(4)(c), (5)(a) and (g), Florida Administrative Code, which prohibit use of institutional privileges for personal gain or advantage, require teachers to maintain honesty in all professional dealings and prohibit submission of fraudulant information on documents in connection with professional activities.[3]

## FINDINGS OF FACT

Upon consideration of the oral and documentary evidence adduced at the hearing, and the prehearing stipulation, I hereby make the following relevant factual findings.

Respondent holds Florida teaching certificate 473297 issued by the Florida Department of Education covering the area of auto body repair. At the times material hereto, Respondent was employed by the Dade County School Board as an auto body instructor at Robert Morgan Vocational Technical Institute (herein sometimes referred to as "Robert Morgan").

Respondent began his employment at Robert Morgan on a part-time basis during May of 1980 and was employed on a full-time basis during August of 1980. Prior thereto, Respondent had been employed in private industry working at Williamson Cadillac for several years and, later, Rhinehart Volkswagen. Respondent had worked in the auto body industry for approximately 20 years prior to being employed at Robert Morgan.

The Dade County School District has adopted an internal accounting operating policy and procedure for production shops numbers 2–6 which was in effect during the time of Respondent's employment. (Joint Exhibit 21) Additionally, Robert Morgan adopted "management procedures and policies" which were set forth in a production manual, copies of which were provided to all production shop instructors. (Joint Exhibit 21) .

School Board policy and school production policy provides that the following individuals may have their automobiles worked on in Robert Morgan's Auto Body Repair Shop: (a) students currently enrolled in a particular program (in this case, auto body); (b) employees of the Dade County School District; and (c) non-profit organizations which submit a request to the school principal and whose requests are accepted.

---

[3] Petitioner's, the School Board of Dade County, charges are grounded upon the same factual allegations. It is there alleged that such conduct, by Respondent, is violative of Sections 231.09 and .36, Florida Statutes, and Sections 6B-1.06(4)(c) and (d), (5)(a) and (g) and 6B-4.09(1)(a), (2), (3) and (6), Florida Administrative Code.

**150**

(Joint Exhibit 21) School Board policy and school production policy each require the preparation of a Work Order for each job received in the Auto Body Shop. Each customer is required to sign the Work Order disclaimer statement set forth in the Work Order form prior to the performance of any service upon the automobile. (Joint Exhibit 21)

School Board policy and School Board production policy requires that a deposit be received for work to be performed in the event that the estimated costs exceed a sum of $50. The customer is required to make a deposit for the amount of the estimated cost over $50 which deposit is submitted to the School Treasurer prior to performance of the requested repairs. (Joint Exhibit 21)

School production policy provides that the instructor completely fill in the upper portion of the Work Order. (Section IX, B of the School Board production policy) After the work is completed, the instructor must complete the description of materials used on work performed, including all charges for parts, supplies, shop fees, taxes and the final total to be paid by the customer. (Section IX, G of School Board production policy) The instructor thereafter sends the complete Work Order to the Treasurer's Office where the Treasurer checks the accuracy of totals on the Work Order. The instructor then notifies the customer that the work is completed and ready for pick-up. At that time, the instructor informs the customer of the total amount due and where the customers go to pay for services. The repaired automobile "shall not be released" until the customer presents a paid receipt from the Business Service Office to the instructor. (Section IX, H, I, and J of School Board production policy)

Both School Board policy and School Board production policy prohibit any instructor, student or school employee from soliciting or accepting gratuities or remuneration for production work performed on the school premises or during school hours. No instructor, student or School Board employee is permitted to use his position to solicit work for private business or outside interests. (Joint Exhibit 21)

At the beginning of each school year involved herein, Dade Program Coordinator, Clifton Lewis, conducted in-service meetings with all instructors to review School Board and Robert Morgan production policies which were contained in the Teachers' Handbook. At these in-service meetings, which Respondent attended, production policies were discussed in detail. Coordinator Lewis discussed any problem areas which may have arisen in the past as well as any discrepancies noted in their audit report in order that such matters might be corrected. Respondent attended these in-service meetings prior to the commence-

**151**

ment of both the 1980-81 and 1981-82 school years. Additionally, Coordinator Lewis discussed School Board and Robert Morgan production policy with instructors informally from time to time when a discrepancy or problem would arise during the course of the school year.

During Respondent's first year of employment at Robert Morgan (1980–81), Coordinator Lewis' practice was to meet with first-year teachers every Wednesday to cover school production policies. Respondent attended those meetings. Among the subjects covered during these weekly meetings were the payment of deposits by customers for work to be performed as well as school policy requiring customers to pay in full for their vehicle prior to its removal from school grounds. Respondent attended approximately 60 of such meetings during his tenure at Robert Morgan. While the policy has been modified and has changed from time to time, at no time did Respondent indicate to Coordinator Lewis during any of those meetings that he did not understand the policies as discussed. Respondent received a Teachers' Handbook for the 1980-81 school year which incorporated Robert Morgan production policy. (Joint Exhibit 20)

Sometime after August 24, 1982, Respondent signed a Memorandum of that date indicating that he read and that he had a working knowledge of the Robert Morgan Production Policy Manual. (Joint Exhibit 19) Additionally, Burton Watkins, the evening Program Coordinator at Robert Morgan during Respondent's employment, conducted in-service training for Respondent both individually and collectively with other instructors. Respondent attended those sessions during the 1980-81 school years. During those sessions, Watkins discussed county and school policy concerning clientele and such matters as whose automobile may be repaired, methods of payment, requirement for deposits and a requirement for payment in full prior to a removal of the vehicle from school grounds. Respondent never expressed a lack of understanding of the applicable policies for the Auto Body Repair Shop to Coordinator Watkins. (TR volume 3, pages 98 and 99) Additionally, Robert Snyder, Assistant Principal at Robert Morgan from August, 1980 through August, 1983, discussed the Auto Body Shop procedures with Respondent several times. Based thereon, it is found that during his tenure as an auto body repair instructor at Robert Morgan, Respondent was aware of School Board and Robert Morgan policies and procedures with respect to processing automotive body work in his day and evening classes. Respondent received excessive formal and informal training from Coordinators Lewis and Wat-

152

kins and he (Respondent) indicated his working knowledge of that policy in writing on or about August 24, 1982.[4] (Joint Exhibit 19)

Robert Morgan production policy specified that when an instructor orders parts for production work, the Work Order number is supplied to the vendor as the purchase order number. (Section VIII, A, Joint Exhibit 21)

On or about November 12, 1980, Respondent prepared a Work Order, number 5997, for himself upon which he indicated that materials were ordered from Service Auto Supply of Homestead in the amount of $255. (Joint Exhibit 24) The invoice received by Robert Morgan from Service Auto Supply of Homestead dated November 17, 1980 in the amount of $255 was paid by the school on or about January 30, 1981. (Joint Exhibit 25)

Frances Mesiano, school Bookkeeper, received the bill from Service Auto Supply and contacted Respondent concerning that Work Order when she discovered that she had not received any deposit for the Work Order and she did not know who the work was for. Respondent acknowledged to Ms. Mesiano that it was for himself and that he would bring the Work Order to her. (TR volume III, page 70) Ms. Mesiano told Respondent that "You need to pay us some money on that. I'm paying it out of school funds and I do not have a deposit on it." Respondent indicated that he would do so; however, when he failed to make any payment by the end of the month, Ms. Mesiano reported the matter to Mr. John White, Vice Principal, who spoke to Respondent about the matter. Following the conversation with Mr. White, Respondent gave Ms. Mesiano a deposit on May 8, 1981 of $150, and the balance due of $105 which Respondent owed Robert Morgan on that Work Order remained unpaid until April 15, 1983. (TR volume III, pages 170–173) The parts Respondent purchased during November of 1980 consisted of a front and rear "spoiler" which he intended to mount on a personal automobile which he was in the process of customizing. (TR volume IV, page 333) When Respondent paid the balance owed to Robert Morgan for the parts ordered during November of 1980, he was under investigation by Petitioner, Dade County School Board, for violation of School Board policies.

On March 2, 1982, Respondent accepted for repair at Robert Morgan a 1974 Porsche automobile owned by Roy E. Bates. Mr. Bates was not a Dade County School Board employee. Kenneth Rogers, Assistant Principal at Homestead Junior High School, had previously

---

[4] In making this finding that Respondent was trained and familiar with production policies, as noted hereinafter, these policies often changed.

discussed purchasing that car from Mr. Bates, if Mr. Bates would have certain body damage repaired. Mr. Rogers recommended that Mr. Bates contact Respondent about performing the necessary repairs. Mr. Rogers contacted Respondent and advised him that a friend of his had a Porsche which he (Rogers) wanted to buy if the body damage to the automobile was repaired. Mr. Rogers asked Respondent if he would repair it. Rogers told Respondent that the car belonged to a friend and that he was going to buy it if it was repaired. Initially, Messrs. Bates and Rogers planned on having Respondent repair the automobile at Respondent's home but they were unable to contact Respondent at home. Respondent finally told Rogers to have the automobile brought to Robert Morgan. Mr. Bates drove the Porsche to Robert Morgan one evening, followed by Mr. Rogers. After examining the body damage, Respondent told Mr. Bates that he would need $400 "to get started." Mr. Bates gave Respondent a check dated March 2, 1982 in the amount of $400 payable to Respondent. (Joint Exhibit 1) Mr. Bates left the Porsche at Robert Morgan's Auto Body Shop, or in the immediate vicinity thereof. (TR volume I, pages 48–50)

Approximately one month later, Respondent contacted Mr. Rogers to request more money for the repair work to the Porsche. Mr. Rogers talked to Mr. Bates, who gave Mr. Rogers a check in the amount of $200 made payable to Respondent. Mr. Rogers gave the check to Respondent. A day later, Respondent contacted Mr. Rogers and requested that he come pick up Mr. Bates' check, give it back to Mr. Bates and tell him to issue a new check made payable to Robert Morgan. Mr. Rogers relayed that information to Mr. Bates.

Respondent later went to Mr. Bates' home to discuss the matter. At that time, Respondent requested that Mr. Bates tell anyone who inquired that the $400 check which Mr. Bates had first given him was for the rental of a mobile home. Respondent also requested that Mr. Bates reissue the $200 check, this time made payable to Robert Morgan. At the time, Respondent was concerned about the investigation being conducted of him by the Petitioner, Dade County School Board.

Mr. Bates told Respondent that he would not lie about the origin and the reason for the $400 check. Respondent thereafter became angry and made what Mr. Bates considered to be an "indirect threat" to the effect that he would hate to see anybody like Mr. Bates with his position giving trouble. (TR volume I, page 31-32) Mr. Bates never leased a mobile home, motor home or trailer of any kind from Respondent.

At Respondent's request, Mr. Bates wrote another check made

154

payable to the Dade County School Board in the amount of $200. Mr. Bates, however, stopped payment on the check several days later. (TR volume I, pages 26, 27)

Once the investigation of Respondent was underway by the Dade County School Board, Mr. Rogers was interviewed by School Board Investigator Dodson concerning the $400 check issued to Respondent. Respondent thereafter contacted Mr. Rogers and asked him to change his story that he had given the investigator telling him that he had made a mistake and that the check was not for parts but for the rental of a camper. Mr. Rogers advised Respondent that he could not do that whereupon Respondent told him that if he got in trouble, it would be because he was trying to do both Rogers and Bates a favor. In a later telephone conversation, Respondent told Mr. Rogers that he had gotten in trouble because he was doing Mr. Bates and him a favor. At that time, Respondent warned Mr. Rogers about showing up for a hearing in this case. Also, Respondent made what Mr. Rogers considered to be a veiled threat.

Mr. Bates' 1974 Porsche automobile sat on Robert Morgan school grounds from March 2, 1983 until near the end of the 1982–83 school year when it was towed away. The car was sold by the towing company that picked it up from school grounds.

Respondent assigned Work Order number 10337 to the Porsche. The Work Order was not fully completed by Respondent. Respondent indicated on the Work Order, however, that the vehicle was owned by Ken Rogers.

When Coordinator Lewis inquired of Respondent concerning the Porsche prior to the summer of 1982, Respondent advised him that it was "a night job," indicating the Mr. Watkins, the evening Coordinator, was aware of the car and had accepted it for repair. (TR volume I, page 75) When Mr. Watkins first noticed the Porsche sometime in 1982, he inquired of Respondent concerning the vehicle and was informed that Coordinator Lewis, the day Coordinator, had approved the car for repair. (TR volume I, page 105)

Students of Robert Morgan in the evening program performed work to the left rear quarter panel of the Porsche automobile in the body shop used by night students.

Respondent did not pay over to Robert Morgan the $400 given him by Roy E. Bates at Robert Morgan on or about March 2, 1982. Instead, Respondent endorsed and cashed Mr. Bates' check himself. (Joint Exhibit 1)

When Coordinator Lewis inquired of Respondent concerning the

**155**

$400 check written to him by Mr. Bates, Respondent told him that the money was for the rental of his "motor home." (TR volume I, page 83) A few days later, Respondent made the statement in Coordinator Lewis' presence that Mr. Bates' $400 payment was for a trailer which he had made for Mr. Bates.

Respondent acknowledges that he negotiated the $400 check written to him by Mr. Bates. Respondent purchased a left rear quarter panel and a front bumper which he used to repair the Porsche automobile.

When Coordinator Lewis discussed a $200 check written by Mr. Bates, Respondent told him that Mr. Bates was the owner of the Porsche, although Respondent had previously told Coordinators Lewis and Watkins that Mr. Rogers owned the vehicle.

On or about September 23, 1982, Respondent ordered parts totalling $424.41 from Toyota of Homestead, giving said parts supplier a purchase order number 10330. (Joint Exhibit 3) Respondent ordered those parts to repair his personal Toyota truck which was damaged in an auto accident. The parts ordered by Respondent for his truck were ordered on the wholesale account of Robert Morgan. Respondent signed for the parts when they were delivered to Robert Morgan. (Joint Exhibit 3)

On or about October 8, 1982, Respondent ordered an air conditioner from Toyota of Homestead on the account of Robert Morgan for installation in his personal Toyota truck. Respondent provided Toyota of Homestead with purchase order number 10341. The air conditioner ordered on the account of Robert Morgan cost $425. (Joint Exhibit 4)

Respondent prepared Work Order 10330 to indicate that the work to be done by the Robert Morgan Auto Body Shop was for a 1979 Chevrolet owned by Dr. Burt M. Kleiman, a School Board employee. (Joint Exhibit 15) Dr. Kleiman's Chevrolet had, in fact, been repaired under Work Order 10328. (Joint Exhibit 14)

Respondent assigned Work Order number 10341 to himself on or about October 7, 1982, in order to use said Work Order as a purchase order for ordering the air conditioning unit for his Toyota truck from Toyota of Homestead. (Joint Exhibit 16) Respondent placed no information on Work Order number 10341 to indicate that the work to be performed pursuant to that Work Order would be upon his personal vehicle.

Ms. Mesiano, the School Treasurer, first received notice from Toyota of Homestead in November, 1982 of outstanding charges on the account of Robert Morgan. She requested duplicate copies of the

**156**

invoice from Toyota of Homestead. Upon examining the duplicate Work Orders, she determined that the purchase order numbers coincided with Work Orders contained within Respondent's lot of Work Orders. Ms. Mesiano called Respondent on the telephone to inquire about which customers those Work Orders were for. Respondent told Ms. Mesiano that the Work Orders were not with him, that they were in his car and that he would have to call her back with the information. Later that day, Respondent told Ms. Mesiano that Work Order 10330 was his and that he would get her a duplicate copy of the invoice from Toyota of Homestead. Later that same day, Respondent also advised Ms. Mesiano that Work Order 10330 involved an insurance settlement on his part.

Tom Huddleston, Parts and Service Director for Toyota of Homestead, contacted Respondent when their invoice for parts ordered by Respondent and delivered during September and October, 1982 went unpaid past thirty days. Respondent advised Mr. Huddleston that he would look into the matter and "get it squared away." (TR volume I, pages 130–131)

When the matter remained unpaid the following month, Mr. Huddleston again contacted Respondent and Respondent told him that he would clear the matter up with Robert Morgan. During December of 1982, Mr. Huddleston personally visited Robert Morgan and spoke to Respondent. Respondent told Mr. Huddleston that there would be no problem in getting the bill paid.

On December 16, 1982, Respondent called Mr. Huddleston and told him that the school (Robert Morgan) wanted him to pay the bill. Respondent requested that Mr. Huddleston send him a copy of the statement. Mr. Huddleston complied that same day. (TR volume I, pages 134–135)

When Respondent had not paid the bill by January, 1983, Mr. Huddleston contacted Respondent about getting the payment for the bill. During that period, Respondent agreed to pay the bill in two installments beginning the first of February and the remaining 50 percent on the first of March. At that time, the bill totalled $751.41. Mr. Huddleston agreed with Respondent's assumption of the financial responsibility for the bill and to his method of repaying one half the bill in February and the remaining one half in March, 1983.

Respondent failed to make the 50 percent payment, as agreed, on February 1, 1983. Mr. Huddleston attempted to get the payment and Respondent asked him (Huddleston) to send his driver by Robert Morgan to pick up some money from him. When the driver returned,

**157**

he presented Mr. Huddleston with a check in the amount of $100, which amount was unacceptable and not in conformance with the agreement. Respondent became hostile, accused Mr. Huddleston of "hassling" him and told Mr. Huddleston to throw the check in the garbage. (TR volume I, pages 138, 139)

Following receipt of the check for $100, Mr. Huddleston prepared a letter dated February 25, 1983 to the Principal of Robert Morgan concerning the matter. (Joint Exhibit 5) In the letter, Mr. Huddleston and Mr. John A. Machado, General Manager of Toyota of Homestead, outlined the contacts which they had recently made with Respondent. In summary, they demanded that the school immediately pay the bill in full. Following said correspondence, Respondent contacted Mr. Machado and arranged to pay $100 a week until the bill was paid in full. Toyota of Homestead then negotiated Respondent's first $100 check and then received a second check in the amount of $100 on March 14, 1983. They received no further payments from Respondent during that month and determined that they should go back and demand full payment from Robert Morgan. Toyota of Homestead sent Robert Morgan a statement dated March 31, 1983 for the balance due of $551.41 with the notation contained thereon that "Mr. Johnson has failed to keep the agreement with us of $100 every week. We request that you pay the balance in full immediately." (Joint Exhibit 6) As of the date of the final hearing herein, there remains an outstanding balance of $351.41 due Toyota of Homestead on the account of Robert Morgan for Toyota truck parts Respondent ordered for his personal truck during September and October, 1982.

On November 28, 1982, a friend suggested that Sally Bradley, a retiree, contact Robert Morgan concerning auto body repairs which she desired for her 1972 Ford LTD.[5] Ms. Bradley lives in the Pine Wood Villas senior citizens' section of the Perrine/Cutler Ridge area. Those villas are owned by the Lutheran Church for the Elderly.

Ms. Bradley was told to contact Respondent while she attended a Christmas party at the Veterans of Foreign Wars on November 28, 1982. She was referred to the school by Edward Oberlies, a photographer for the News Leader, a local newspaper. Ms. Bradley was talking about her car being "rusted out" and wanted body work done. Mr. Oberlies informed her that they had a body shop at Robert Morgan

---

[5] Respondent's counsel made a motion to strike the testimony of Sally Bradley. That motion was tentatively denied during the hearing and Ms. Bradley was permitted to testify. After consideration of Ms. Bradley's testimony and the Respondent's motion to strike her testimony, the motion to strike Ms. Bradley'g testimony is denied.

school and that some of the instructors there "moonlighted." Ms. Bradley contacted the school during early December and asked to speak to someone in the body shop. Ms. Bradley learned that Archie Johnson worked on cars at his home so she asked, "May I speak with him?"

Respondent was summoned to the phone and he spoke with Ms. Bradley arranging to inspect her automobile at her house on December 5, 1982. Based on Ms. Bradley's testimony which indicates that she was looking for someone to do the work at their home; the fact that no work was done by Respondent to Ms. Bradley's car while on school premises, and, finally, that no work was done to Ms. Bradley's car by Respondent during school hours, this situation involves a purely private matter which was not prohibited by the school's policies or were in some other manner, in violation of the Petitioner, Department of Education's rules and regulations.[6]

On March 28, 1983, Carol Fontani, a teacher at Killian High School, took her 1978 Lancia automobile to the vicinity of Robert Morgan in order to have it painted by Respondent's class. Ms. Fontani and her husband previously had their 1976 Dodge Charger painted by Respondent's class at Robert Morgan and were pleased with the results. Prior to that time, Ms. Fontani had spoken to Respondent about getting her Lancia painted at the school and Respondent had advised her that he did not think that a second car could be painted within a short span of time following repairs of her first car. Respondent agreed to check into that situation and advised Ms. Fontani that he could not paint her Lancia at school but that he would do so at his home. Ms. Fontani agreed and requested an estimate as to the charges to paint the Lancia. Respondent gave a $450 estimate to Ms. Fontani. Respondent demanded and Ms. Fontani gave him a $200 deposit, made

---

[6] In making this finding, the undersigned carefully considered Ms. Bradley's testimony, the notice of charges, and the administrative complaint filed by Petitioners and concluded that this is a matter which is not properly embraced within the confines of the charges or the complaint filed herein. As an aside, after reviewing Ms. Bradley's testimony and contrasting it with that of Respondent, it was indeed unfortunate that Respondent took an inordinate amount of time (approximately 3 months) to determine that, due to the condition of Ms. Bradley's car, it was not feasible to do the extensive repairs necessary to repair her car inasmuch as it had apparently been subjected to harsh winters in the northeast (the Pittsburgh area). Upon learning of that fact, Respondent advised Ms. Bradley of his findings and recommended that she forego any plans to repair her vehicle. Respondent returned Ms. Bradley's vehicle along with the deposit. The other charges by Ms. Bradley respecting Respondent's conversion of her battery and his negligence by exposing it to the elements are incredible based on my examination of the testimony, the photos and the other evidence introduced herein.

**159**

payable to him. Approximately one month later, on April 25, 1983, Ms. Fontani, her husband and their two children, went to Robert Morgan in the evening to pick up their car. A student accompanied the Fontanis to Respondent's home where they picked up their Lancia automobile. When the Fontanis arrived at Respondent's home, Respondent's wife, Mrs. Johnson, asked for the remaining balance of $250 before giving them the car keys. The Fontanis indicated that they were pleased with the way the car looked and openly praised Respondent's workmanship to Mrs. Johnson and the student who accompanied them to Respondent's home. The Fontanis stopped payment on the $250 check given Mrs. Johnson the following morning claiming that the work was shabbily done and that they could not determine the shoddiness of Respondent's work until the following morning.[7]

After learning that he was under investigation for violation of School Board and school policies, Respondent made numerous charges of alleged violations of School Board and school policies and procedures by school administrators and his colleagues including allegations against a fellow auto body instructor, Charles Taylor, Assistant Principal, Robert Snyder, evening Program Coordinator, Burton Watkins and Robert Morgan's Treasurer, Frances Mesiano. Petitioner, Dade County School Board, conducted an internal investigation of the allegations of impropriety leveled against administrators and colleagues by Respondent. As a result of that investigation, Respondent's allegations were determined to be "unfounded." (TR volume II, page 201 and Stipulation of Respondent's counsel)

Respondent's conduct, as set forth herein, generated notoriety beyond that reported in the media, which notoriety adversely affected both Respondent's effectiveness and the standing of Robert Morgan in the community. As a result of Respondent's orders of parts for his Toyota truck from Toyota of Homestead on the account of Robert Morgan, Robert Morgan lost its good credit standing with the auto suppliers. (TR volume I, page 148) Additionally, Toyota of Homestead intends to sue Robert Morgan if the remaining balance on Respondent's bill is not paid.

Respondent's unfounded accusations against fellow Robert Morgan employees further impaired his effectiveness in that they no longer trust

---

[7] The testimony of Ms. Fontani and Respondent are contradictory as to the events surrounding this transaction. After consideration of their testimony, it is herein found that the version offered by the Respondent is more credible and to the extent that Ms. Fontani's testimony differs from Respondent's, the version offered by Respondent is credited. Additionally, the testimony of the student who accompanied the Fontanis to Respondent's home corroborates the version of testimony offered by Respondent.

him nor would they want to work with him in the future. (TR volume II, page 330; volume III, page 113 and 182)

According to the expert testimony of Dr. Pat Gray, Executive Director, Division of Personnel Control for the Dade County Public Schools and an employee of the school system since approximately 1965, Respondent has "clearly failed to demonstrate the standards expected of a public school teacher. He has impugned the integrity of himself as well as that of the education profession and, in so doing, he has violated the specific statutes and state regulations with regard to the expected standards for public school teachers." (TR volume III, pages 146, 147) Respondent's effectiveness "has been so seriously diminished and reduced that he could not possibly function in an efficient and professional manner as a public school teacher."

Respondent's performance as an instructor during his tenure at Robert Morgan Vocational Technical Institute has been outstanding. While his performance is not here at issue, it is, no doubt, the reason that he has found himself here in violation of Petitioners' rules and regulations. Respondent was sought out by fellow school board employees and administrators to perform work on their private vehicles. Respondent, having come from the private industry, had no prior experience with the procedures expected of instructors in the various vocational technical shops at Robert Morgan, the largest vocational technical school in the southeast.

Also, during the period of Respondent's tenure, the production policy at Robert Morgan was anything other than static. As example, during 1980, the policy changed respecting when a deposit had to be placed for a customer who wanted his automobile painted. Also, policies as to when the Work Order would be signed were indefinite during 1981. As example, it was as likely that a Work Order could be signed on picking up an automobile as upon dropping it off. (Testimony of John D. White, Vice Principal at Robert Morgan from its inception through 1983)

Finally, while the results of the Petitioner's, School Board of Dade County, internal investigation revealed that the allegations of impropriety filed by Respondent against administrators and his colleagues were unfounded, the facts herein do not support a conclusion that they were made maliciously and with knowledge that the charges were false. Respondent credibly testified herein that he believed those charges were true and he was encouraged by Dr. Patrick Gray to give him information concerning those matters.

Respondent's conduct as set forth herein is the type of conduct that

161

cannot be countenanced by the Petitioners. Given the Respondent's prior work experience, his on-the-job performance, the continued state of flux of the Petitioner's, Dade County School Board, production policy in effect at Robert Morgan, and the entire circumstances herein, coupled with the fact that Respondent was at no time ever issued a written reprimand or disciplined in any other way for any violation of School Board policy much consideration was given as to the imposition of an appropriate penalty. Based thereon, the ultimate penalty of termination and revocation of Respondent's teaching certificate for a period of ten years, as requested by Petitioners, would be too harsh and does not appear to be indicated by the facts herein. I shall therefore recommend lesser penalties.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction of the subject matter and the parties to this action. Section 120.57(1), Florida Statutes.

2. The parties were duly noticed pursuant to the notice provisions of Chapter 120, Florida Statutes.

3. The authority of the Petitioners is derived from Chapter 231, Florida Statutes, and Rule Chapter 6B, Florida Administrative Code. Respondent, a certified teacher holding Florida teaching certificate 473497 issued by the Florida Department of Education covering the area of auto body repair and valid through 1986, is subject to the disciplinary guides of Section 231, Florida Statutes.

4. Section 231.28(1)(c), Florida Statutes, provides that an individual's teaching certificate may be suspended, revoked or otherwise disciplined if it can be shown that he has been guilty of gross immorality or an act involving moral turpitude.

5. Section 231.28(1)(f), Florida Statutes, provides that an individual's teaching certificate may be suspended, revoked or otherwise disciplined if it can be shown that, upon investigation, the certificate holder has been found guilty of personal conduct which seriously reduces his effectiveness as an employee of the School Board.

6. Section 231.28(1)(h), Florida Statutes, provides that an individual's teaching certificate may be suspended, revoked or otherwise disciplined if the individual violates rules of the State Board of Education, the penalty for which is the revocation of the teaching certificate.

7. Rule 6B-1.06(2), Florida Administrative Code, provides that a violation of any of the principles of professional conduct for the education profession in Florida subjects the individual to revocation or

162

suspension of his teaching certificate or other penalties provided by law.

8. Rule 6B-1.06(4)(c), Florida Administrative Code, provides that an educator "shall not use institutional privileges for personal gain or advantage."

9. Rule 6B-1.06(4)(c), Florida Administrative Code, provides that an educator "shall maintain honesty in all professional dealings."

10. It is concluded that the conduct of Respondent set forth in the Findings of Fact section of this Recommended Order has resulted in the serious reduction of his effectiveness as an employee of the Dade County School Board.

11. Respondent violated Rule 6B-1.06(4)(c), Florida Administrative Code, by ordering auto parts from Service Auto Supply for his personal automobile in November of 1980 and failing to pay for the same until April 15, 1983, thereby using institutional privileges for personal gain.

12. Insufficient evidence was offered to establish that the Respondent used institutional privileges for personal gain or advantage in violation of Rule 6B-1.06(4)(c), Florida Administrative Code, based on the allegation that he converted Roy Bates' $400 deposit for repair of his 1974 Porsche automobile to his own use rather than paying the funds into the account of Robert Morgan, as required. Likewise, insufficient evidence was offered herein to establish that the Respondent violated Rule 6B-1.06(5)(g), Florida Administrative Code, by the allegation that he submitted fraudulent information on documents in connection with professional activities in that he falsely indicated on Robert Morgan's Work Order number 10337 that the automobile was the property of Ken Rogers when, in fact, it was the property of Roy Bates. The evidence does not establish any acts of deceit and/or dishonesty with respect to the 1974 Porsche. If there were, indeed, any acts of deceit and/or dishonesty, they were the product of attempts by Mr. Bates to get Respondent to repair the Porsche which was owned by Mr. Rogers.

13. Respondent used institutional privileges for personal gain in violation of Rule 6B-1.06(4)(c), Florida Administrative Code, by using the credit of Robert Morgan established with Toyota of Homestead to order various parts for his personal Toyota truck in September and October, 1982. Respondent failed to prepare Work Orders for his Toyota truck to be repaired at Robert Morgan, failed to pay the required deposit to Robert Morgan and, in fact, failed to pay in full for the parts supplied by Toyota of Homestead by payment to either Robert Morgan or directly to Toyota of Homestead.

163

14. Respondent's violation of Dade County School Board and Robert Morgan policies and procedures for the auto body shop constitutes personal conduct which seriously reduces his effectiveness as an employee of the Dade County School Board in violation of Section 231.28(1)(f) and 231.09 and .36, Florida Statutes.

15. As to each and every other Count not referred to herein in the Conclusions of Law section, they are found to be without merit.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is RECOMMENDED:

1. That the Petitioner, School Board of Dade County, Florida, enter a Final Order affirming its suspension of the Respondent without pay through the end of the 1983-84 regular school year.

2. That the Petitioner, Department of Education, Education Practices Commission, enter a Final Order suspending Respondent's teaching certificate number 473497 issued by the Florida Department of Education covering the area of auto body repair for a period of one (1) year from the date of his suspension by Petitioner, School Board of Dade County.[8]

---

[8] In making these recommendations, as noted hereinabove in the Findings of Fact section of this Recommended Order, the Petitioners' request for ultimate penalties of permanent dismissal from all employment (by the Dade County School Board) and a ten-year revocation of Respondent's teaching certificate (by Petitioner Education Practices Commission) would be too harsh and is not indicated by the facts and conclusions found herein.